UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| NESTLE USA, INC., and SOCIETE DES PRODUITS NESTLE S.A., | § § § | No. 5:20–CV–384–DAE |
| Plaintiffs, | § § | |
| vs. | § § | |
| ULTRA DISTRIBUCIONES MUNDIALES S.A. DE C.V., and ULTRA INTERNATIONAL DISTRIBUTORS, INC., | § § § § | |
| Defendants. | § § § | |

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

Before the Court is Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint, filed by Ultra Distribuciones Mundiales S.A. de C.V. ("Ultra Mundiales") and Ultra International Distributors, Inc. ("Ultra International") (collectively, "Defendants") on August 15, 2020.  (Dkt. # 37.)  Pursuant to Local Rule CV-7(h), the Court finds this matter suitable for disposition without a hearing.  After careful consideration of the memoranda filed in support of and against the motion, the Court—for the reasons that follow—**GRANTS** the motion in part and **DENIES** the motion in part.

1

FACTUAL BACKGROUND

This dispute concerns Defendants' sale and distribution of Nestlé products in the United States from Mexico.  Nestlé USA, Inc. ("NUSA") and Societe des Produits Nestlé S.A. ("SPN") (collectively, "Plaintiffs") are wholly-owned subsidiaries of Nestlé, S.A.  (Dkt. # 37.)  NUSA sells Nestlé food and beverage products throughout the United States.  (Dkt. # 26.)  SPN owns Nestlé's trademarks in the United States.  (Id.)  NUSA is the exclusive licensee of those trademarks and all of their associated rights.  (Id.)  According to Plaintiffs, "NUSA is responsible for the marketing, labelling, and distribution of Nestlé food and beverage products in the United States."  (Id.)

Ultra Mundiales is a Mexican-based global distributor of Mexican products, including products manufactured by Nestlé Mexico that are intended for sale only in Mexico.  (Id.)  Ultra International is a Texas-based subsidiary of Ultra Mundiales that imports and sells Mexican products in Texas, California, and elsewhere in the United States.  (Id.)  According to Plaintiffs, these products include Nestlé Mexico products that Ultra Mundiales gives to Ultra International to sell in those locations.  (Id.)  The products allegedly use Nestlé trademarks, including the trademarks "Nescafé" and "Nido."  (Dkt. # 41.)  Neither Defendant is an owner or licensee of Nestlé trademarks in the United States, and Plaintiffs have not authorized Defendants to sell Nestlé-trademarked products that are intended for

sale in Mexico to U.S. consumers.  (Dkt. # 26.)  The products are therefore "gray market goods," which means that they are "foreign manufactured goods, for which a valid United States trademark has been registered, that are legally purchased abroad and imported into the United States without the consent of the American trademark holder."  Weil Ceramics & Glass, Inc. v. Dash, 878 F.2d 659, 662 n.1 (3d Cir. 1989); see K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 285 (1988).

Plaintiffs allege that Defendants' sale of these "gray market" Nestlé products in the United States has created consumer confusion.  (Id.)  Specifically, purchasers and others in the United States "are likely to believe NUSA authorizes and controls the sale of Defendants' products, or that Defendants are associated with or related to NUSA or are authorized by NUSA to distribute or sell the NUSA Products in the United States."  (Id.)

Plaintiffs allege that the gray market products look very similar to the corresponding NUSA products, but they are materially different.  (Id.)  For instance, some differences concern the products' regulatory compliance.  (See id.)  According to Plaintiffs, the gray market products are not properly labeled in compliance with FDA regulations.  (Id.)  For example, some labels are only in Spanish or contain different nutritional information than the NUSA version of those products.  (Id.)  In addition, Plaintiffs contend that the gray market products "may contain formulations not intended for the United States market, and/or are

3

not subject to NUSA's rigorous quality control standards for post-sale services."

(Id.)  Plaintiffs contend that Defendants' actions have resulted in "substantial

losses to NUSA and its authorized distributors, disruptions to NUSA's business

relationships with its customers[,] and the rights that NUSA has granted to its

authorized distributors."  (Id.)

PROCEDURAL HISTORY

Plaintiffs allege the following claims in their First Amended

Complaint: (1) federal trademark infringement; (2) federal false designation of

origin and unfair competition; (3) federal trademark dilution; (4) federal unlawful

importation of goods infringing U.S. trademarks or names; (5) trademark dilution

under Texas law; (6) trademark dilution under California law; (7) statutory unfair

competition under California law; (8) unfair competition by misappropriation; (9)

common law unfair competition; and (10) tortious interference with existing

business relations.  (Dkt. # 26.)  On August 15, 2020, Defendants filed a motion to

dismiss the Amended Complaint.  (Dkt. # 37.)  In the motion, Defendants seek

partial dismissal of Plaintiffs' claims.[1]  (See id.)  Plaintiffs responded to the motion

---

[1] Defendants do not seek dismissal of Plaintiffs' claims for California trademark
dilution (Count 6) or unfair competition by misappropriation (Count 8).
Defendants do mention Plaintiffs' claim for common law unfair competition
(Count 9); however, for the reasons that follow, the Court declines to entertain
Defendants' arguments for dismissing this claim.

on September 25, 2020.  (Dkt. # 41.)  Defendants filed a reply on November 2, 2020 (Dkt. # 46) before filing an amended reply on November 11, 2020 (Dkt. # 47).[2]

## LEGAL STANDARD

Defendants move to dismiss Plaintiffs' claims pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6).

With respect to Rule 12(b)(2), a federal court may exercise personal jurisdiction over a defendant if (1) the state's long-arm statute allows it; and (2) exercising jurisdiction would not violate the Due Process Clause of the Fourteenth Amendment.  Halliburton Energy Servs., Inc. v. Ironshore Specialty Ins. Co., 921 F.3d 522, 539 (5th Cir. 2019).  The two-step inquiry reduces to the federal due process analysis because the Texas long-arm statute extends to the limits of federal due process.  Id.

Federal due process requires two things.  First, the plaintiff must show that the defendant purposefully availed himself of the benefits and protections of the forum state by establishing minimum contacts with the state.  Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co., 517 F.3d 235, 243 (5th Cir. 2008).  Second, the "exercise of jurisdiction . . . does not offend traditional notions of fair

---

[2] Defendants filed an amended reply in order to remove a section from their original reply that applied the common control exception to Plaintiffs' Lanham Act claims for the first time.  (See Dkt. # 47 at 1 n.1.)

play and substantial justice." Id.  When determining whether the exercise of jurisdiction is unfair or unreasonable, the Court examines five factors: (1) the burden on the nonresident defendant; (2) the forum state's interests; (3) the plaintiff's interest in securing relief; (4) the interest of the interstate judicial system in the efficient administration of justice; and (5) the shared interest of the several states in furthering fundamental social policies.  Burger King Corp. v. Rudzewicz, 471 U.S. 462, 477 (1985).  "[I]t is rare to say the assertion [of jurisdiction] is unfair after minimum contacts have been shown."  McFadin v. Gerber, 587 F.3d 753, 759–60 (5th Cir. 2009) (quoting Wien Air Alaska, Inc. v. Brandt, 195 F.3d 208, 215 (5th Cir. 1999)).

There are two types of minimum contacts: general and specific jurisdiction.  The parties agree that general jurisdiction does not exist in this case. (See Dkts. ## 41, 47.)  Specific jurisdiction exists when a nonresident defendant has purposefully directed its activities at the forum state and the litigation results from alleged injuries that arise out of or relate to those activities.  Burger King, 471 U.S. at 472.  "[A] non-resident defendant can only develop minimum contacts with a forum state through 'actions by the defendant himself that create a substantial connection with the forum State.'"  Halliburton, 921 F.3d at 543 (quoting Burger King, 471 U.S. at 475).  A substantial connection is not formed by the unilateral activity of another party or a third person.  Burger King, 471 U.S. at

6

475; Halliburton, 921 F.3d at 543. "[A]n individual's contract with an out-of-state party alone [cannot] automatically establish sufficient minimum contacts in the other party's home forum." Burger King, 471 U.S. at 478. Courts will evaluate "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing . . . in determining whether the defendant purposefully established minimum contacts within the forum." Halliburton, 921 F.3d at 544 (quoting Gulf Coast Bank & Trust Co. v. Designed Conveyor Sys., L.L.C., 717 F. App'x 394, 399 (5th Cir. 2017)).

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted." To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). In analyzing whether to grant a 12(b)(6) motion, a court accepts as true "all well-pleaded facts" and views those facts "in the light most favorable to the plaintiff." United States ex rel. Vavra v. Kellogg Brown & Root, Inc., 727 F.3d 343, 346 (5th Cir. 2013) (citation omitted). A court need not "accept as true a legal conclusion couched as a factual allegation." Iqbal, 556 U.S. at 678.

7

DISCUSSION

Defendants argue that the Court should dismiss Ultra Mundiales for lack of personal jurisdiction under Rule 12(b)(2).  Defendants also move to dismiss the following claims pursuant to Rule 12(b)(6): (1) federal trademark infringement; (2) federal false designation of origin and unfair competition; (3) federal trademark dilution; (4) federal unlawful importation of goods infringing U.S. trademarks or names;[3] (5) trademark dilution under Texas law; (6) unfair competition under California law; and (7) tortious interference with existing business relations.  The Court will address Defendants' arguments in turn.

I.      Personal Jurisdiction

Defendants maintain that Ultra Mundiales is not subject to personal jurisdiction in Texas and should therefore be dismissed.  (Dkt. # 37.)  Ultra Mundiales is a Mexican company with its principal place of business in Torreón, Coahuila, Mexico.  (Id.)  According to Defendants, the only contact that Ultra Mundiales has with Texas is with its subsidiary, Ultra International, which has its principal place of business in Texas.  (Id.)  Defendants argue that one contractual relationship alone is insufficient to subject Ultra Mundiales to personal jurisdiction in Texas.  (Id.); see Halliburton, 921 F.3d at 544.  Defendants further contend that

---

[3] Plaintiffs do not oppose Defendants' request for dismissal of their claim for Unlawful Importation of Goods Infringing U.S. Trademarks or Names, 15 U.S.C. § 124 and 19 U.S.C. § 1526 (Count 4).  (See Dkt. # 41 at 5 n.1.)

Ultra Mundiales does not export its products to Texas or to any state; it sells and delivers the Nestlé Mexico products to Ultra International *in Mexico*.  (Dkt. # 37.) In their reply, Defendants also maintain that the stream of commerce doctrine for personal jurisdiction does not apply here.  (Dkt. # 47); see Zoch v. Magna Seating (Germany) GmbH, 810 F. App'x 285, 292–93 (5th Cir. 2020).  They contend that it would not be fair or reasonable to exercise personal jurisdiction over Ultra Mundiales because it would be burdensome to litigate in Texas, and Texas courts have minimal interest in this matter.  (Dkt. # 37.)

Plaintiffs argue otherwise.  They maintain that Ultra Mundiales is subject to personal jurisdiction in Texas under the stream of commerce doctrine. (Dkt. # 41.)  According to Plaintiffs, Ultra Mundiales should have been aware that its products would enter Texas and that it could be subject to a lawsuit there.  (Id.) According to bill of lading data, from July through December 2017, approximately $362,000 worth of Nestlé Mexico products were transferred from Ultra Mundiales to Ultra International and imported into Texas.  (Id.)  These products are widely imported and sold to grocers in Texas.  (Id.)  According to Plaintiffs, these grocers include Fiesta Mart, with more than 60 locations throughout Texas; El Rancho Supermercado, with 14 locations in Texas; and Joe V's Smart Shop, with 9 locations in Texas.  (Id.)  Plaintiffs argue that Ultra Mundiales also should have been aware of these facts and that it would be subject to personal jurisdiction in

9

Texas given that it owns 100% of the shares of Ultra International, which is based

in Texas, and the two entities share leadership.  (Id.)  Plaintiffs argue that

exercising personal jurisdiction here would be fair and reasonable.  (Id.)

According to Plaintiffs, requiring Ultra Mundiales to litigate in Texas is not

burdensome given that its headquarters is in the neighboring Mexican state of

Coahuila, and it has substantial resources and experience in this district, where its

subsidiary is headquartered.  (Id.)  Plaintiffs assert that Texas courts have a

substantial interest in this matter because the gray market products are being sold

widely throughout Texas.[4]  (Id.)

In the Fifth Circuit, where a product is sold or manufactured by a

foreign defendant, the court applies a "stream of commerce" approach to personal

jurisdiction.  Ainsworth v. Moffett Eng'g, Ltd., 716 F.3d 174, 177 (5th Cir. 2013).

Under this approach, the "minimum contacts requirement is met so long as the

court 'finds that the defendant delivered the product into the stream of commerce

with the expectation that it would be purchased by or used by consumers in the

forum state.'"  Id. (quoting Bearry v. Beech Aircraft Corp., 818 F.2d 370, 374 (5th

Cir. 1987)).  "'[M]ere foreseeability or awareness [is] a constitutionally sufficient

basis for personal jurisdiction if the defendant's product made its way into the

---

[4] Alternatively, Plaintiffs request that the Court order limited jurisdictional discovery.  (Dkt. # 41.)  However, because the Court finds that Ultra Mundiales is subject to personal jurisdiction in Texas, jurisdictional discovery is not necessary.

forum state while still in the stream of commerce,' but 'the defendant's contacts must be more than random, fortuitous, or attenuated, or of the unilateral activity of another party or third person.'"  Id. (quoting ITL Int'l, Inc. v. Constenla, S.A., 669 F.3d 493, 498 (5th Cir. 2012); Luv N'care, Ltd v. Insta-Mix, Inc., 438 F.3d 465, 470 (5th Cir. 2006)).

The Court agrees with Plaintiffs.  Ultra Mundiales is subject to personal jurisdiction in Texas under the stream of commerce doctrine.  The fact that Ultra Mundiales never sold products in Texas is not determinative.  See Ainsworth, 716 F.3d at 177 ("[M]ere foreseeability or awareness [is] a constitutionally sufficient basis for personal jurisdiction if the defendant's product made its way into the forum state while still in the stream of commerce.").  The facts make it clear that it was foreseeable that the products would be sold in Texas. According to Plaintiffs, from July through December 2017, $362,000 worth of Nestlé Mexico products were transferred from Ultra Mundiales to Ultra International and imported into Texas.  (Dkts. ## 41, 41-1, Ex. 1.)  Further, Ultra Mundiales should have been aware that the Nestlé Mexico products, targeted for Hispanic consumers, would likely be sold in Texas, which has one of the largest Hispanic origin populations of any U.S. state according to NUSA's Vice President of Sales.  (Dkt. # 41-2); see Ainsworth, 716 F.3d at 179 ("[E]ven though [the defendant] did not have specific knowledge of sales by [the third party] in

11

Mississippi, it reasonably could have expected that such sales would be made, given the fact that Mississippi is the fourth largest poultry-producing state in the United States."). According to Plaintiffs, NUSA has also "invested substantial business resources developing a market for the NUSA Products in Texas, including building a distribution network to help drive growth in this market." (Dkt. # 41; see Dkt. # 41-2.) Ultra Mundiales owns 100% of the shares of Ultra International,[5] and the two entities share leadership. (Dkt. # 41.) Gustavo Alberto Garza-Abdo states in his jurisdictional declaration that he has been the General Manager of Ultra Mundiales since 2010, but he is also identified in public reports as the COO of Ultra International during the same time period.[6] (Dkts. ## 37-1, 41, 41-1, Ex. 3.) Similarly, Armando Soberon is identified in public reports as both a director of Ultra Mundiales and the CEO of Ultra International. (Dkt. # 41-1, Exs. 4, 5.)

---

[5] Defendants rely on Halliburton for the proposition that a single contractual relationship with a Texas entity does not establish minimum contacts with Texas. But Halliburton is substantially different from this case. In Halliburton, the plaintiffs argued that the defendants were subject to personal jurisdiction in California because they sold one insurance policy to a Texas resident. 931 F.3d at 544. The Fifth Circuit found that this was not purposeful availment. Id. This case, however, requires an analysis under the stream of commerce approach and involves two entities that have close connections such that the foreign entity should have been aware that its products were being sold in the forum state. Thus, Halliburton provides little guidance in this case.

[6] Plaintiffs point out that Mr. Garza-Abdo similarly indicated on his LinkedIn profile that he is the Managing Director of "Ultra Distribuciones Internacionales." (Dkt. # 41-1, Ex. 3.)

Considering the common leadership between the two companies, the fact that Ultra Mundiales placed its products into the stream of commerce by selling them to a company headquartered in Texas, and the bill of lading data, Ultra Mundiales could have reasonably anticipated being haled into court in Texas. See Ainsworth, 716 F.3d at 179.

Defendants' reliance on the Fifth Circuit's decision in Zoch is mistaken. In Zoch, the plaintiff argued that the defendant should have known that its products would be sold in Texas based on Texas's large population. 810 F. App'x at 291. In other words, because the defendant knew a third party was selling its products in the United States, it should have known that its products were being sold in Texas. Id. At oral argument, the plaintiff in Zoch actually conceded that he did not have any evidence that the defendant was aware that any of its manufactured products would end up in Texas. Id. at 292. Here, there is evidence that Ultra Mundiales was aware that its products would be sold in Texas. Ultra International is headquartered in Texas and there is common leadership between Ultra International and Ultra Mundiales. (See Dkt. # 41.) At the very least, the individuals that hold positions within both entities would have known where the products were likely to be sold. Plaintiffs in this case do not rely on Texas's large population in arguing that Ultra Mundiales should have been aware that its products would be sold in Texas. Further, the Fifth Circuit made clear that

13

Zoch was limited to the facts of that particular case.  810 F. App'x at 293 ("We emphasize that our holding in this case . . . is limited to the specific facts of this case.").

Instead, this case is more similar to Ainsworth.  In Ainsworth, the third party sold the defendant's forklifts in all fifty states, and the defendant made no attempt to limit where the third party sold or marketed its products.  716 F.3d at 179.  A substantial number of the defendant's products were sold in Mississippi, and the sales in Mississippi accounted for approximately 1.55% of the defendant's U.S. sales during that period.  Id.  The forklifts were used for poultry-related uses, so even if he did not have specific knowledge of sales by the third party in Mississippi, "it reasonably could have expected that such sales would be made, given the fact that Mississippi is the fourth largest poultry-producing state in the United States."  Id.  Here, in this case, the products were sold in Texas for a substantial sum, Ultra Mundiales sold its products to its subsidiary that is headquartered in Texas, and Defendants share common leadership.  Further, Ultra Mundiales sold Nestlé Mexico products, which were marketed for Hispanic consumers, and as in Ainsworth, it should have been foreseeable that the products would be sold in Texas, which has the second largest Hispanic population in the United States.  716 F.3d at 179; (Dkt. # 41-2.)  Thus, the Court finds that Ultra Mundiales has minimum contacts with the state of Texas.

14

Defendants failed to demonstrate that the exercise of personal jurisdiction would be unfair or unreasonable. See Luv N' care, Ltd. v. Insta-Mix, Inc., 438 F.3d 465, 473 (5th Cir. 2006) ("When a plaintiff makes its *prima facie* case that the defendant has 'minimum contacts' with the forum state, the burden of proof shifts to the defendant to show that the exercise of jurisdiction would be unreasonable."). Defendants addressed only two of the five factors that courts consider in making this determination, and the Court finds their arguments unpersuasive. It is not burdensome for Ultra Mundiales to litigate in Texas. Ultra Mundiales is headquartered in the neighboring Mexican state of Coahuila, its subsidiary is headquartered in Texas, and its shares leadership with its subsidiary. (See Dkts. ## 37, 41.) Texas courts also have a substantial interest in this matter given that the gray market products are being sold widely by Texas grocers. (See id.) Exercising personal jurisdiction over Ultra Mundiales is fair and reasonable.

Plaintiffs are not required to establish jurisdiction by a preponderance of the evidence. Plaintiffs need only make a prima facie showing, and they have done so here. See Luv N' care, 438 F.3d at 469. The Court therefore denies Defendants' motion to dismiss Ultra Mundiales for lack of personal jurisdiction.

15

II.    Claims Under the Lanham Act

Defendants move to dismiss Plaintiffs' Lanham Act claims under Rule 12(b)(6).  (Dkt. # 37.)  Plaintiffs assert four claims under the Lanham Act: (1) trademark infringement; (2) false designation of origin and unfair competition; (3) trademark dilution; and (4) unlawful importation of goods infringing U.S. trademarks or names.  (Dkt. # 26.)  "Plaintiffs do not oppose Defendants' request for dismissal of their claim for Unlawful Importation of Goods Infringing U.S. Trademarks or Names."  (Dkt. # 41 at 5 n.1).  The Court thus will dismiss this claim.  The Court will address Defendants' arguments for dismissing the remaining three claims under the Lanham Act.

Defendants raise three principal arguments for dismissing these claims.  (See Dkt. # 37.)  First, they contend that Plaintiffs' claims are an improper attempt to privately enforce the Food, Drug, and Cosmetic Act ("FDCA") and regulations imposed by the Food and Drug Administration ("FDA").  (Id.)  Second, they argue that different post-sale services cannot form the basis for Lanham Act violations.  (Id.)  Third, Plaintiffs' false designation of origin claim fails because Plaintiffs cannot allege any misstatement or misrepresentation by Defendants regarding the origin of the gray market products.  (Id.)

16

A.       The FDCA and the Lanham Act

Defendants argue that Plaintiffs impermissibly attempt to enforce the FDCA through their Lanham Act claims.  (Id.)  According to Defendants, Plaintiffs' allegations are rooted in assertions that the gray market products do not comply with the FDCA or FDA regulations and guidance, which would require the Court to make novel interpretations of the FDCA and FDA regulations.  (Dkts. ## 37, 47.)  Because private parties may not enforce the FDCA, Defendants maintain that Plaintiffs' Lanham Act claims should be dismissed.  (Id.)

Plaintiffs, in response, argue that they do not seek to privately enforce these regulations.  (Dkt. # 41.)  According to Plaintiffs, regulatory compliance is just one of many material differences that Plaintiffs provide in support of their Lanham Act claims.  (Id.)  Plaintiffs further contend that the cases Defendants rely on do not apply here because they do not involve gray market goods.  (Id.)

The problem with gray markets is that goods with identical trademarks are sold at different prices in two different geographical regions. Summit Tech., Inc. v. High-Line Med. Instruments Co., 922 F. Supp. 299, 309 (C.D. Cal. 1996).  This creates incentives for individuals to buy the product for a cheaper price in one region and then sell it at a higher price in the other region. Shubha Ghosh, An Economic Analysis of the Common Control Exception to Gray Market Exclusion, 15 U. Pa. J. Int'l Bus. L. 373, 373–74 (1994).  However, the

17

cheaper products are often of a lesser quality than the domestic products, which may disappoint domestic customers when they buy the cheaper products.  See Summit Tech., 922 F. Supp. at 309.  "[T]rademark law protects both the 'producer's investment in goodwill and product quality and the consumer's interest in reducing search costs and being assured of product quality.'"  Id. (quoting Ghosh, supra, at 410).

To allege a trademark infringement claim in the gray market goods context, the plaintiff must allege that "the defendant's foreign goods are materially different" from the authorized goods.  Martin's Herend Imports, Inc. v. Diamond & Gem Trading USA, Co., 112 F.3d 1296, 1301–02 (5th Cir. 1997).  The threshold of materiality is low, and courts "presume[] a likelihood of confusion as a matter of law when the products are materially different."  Id. at 1301; Ferris Mfg. Corp. v. Thai Care Co., No. 4:17-CV-01024-O-BP, 2019 WL 2541000, at *6 (N.D. Tex. May 23, 2019).  Courts have found material differences in gray market goods cases where (1) there are differences in physical appearance of the product;[7] (2) the packaging or labels of the gray market product do not comply with federal or state

---

[7] "The Fifth Circuit has held a difference in the physical appearance of a product is a material difference so long as the defendant is unable to show that an average consumer would not consider the differences in purchasing the product."  Ferris Mfg. Corp. v. Thai Care Co., No. 4:17-CV-01024-O-BP, 2019 WL 2541000, at *6 (N.D. Tex. May 23, 2019) (citing Martin's Herend Imports, Inc. v. Diamond & Gem Trading USA, Co., 112 F.3d 1296, 1301–02 (5th Cir. 1997)).

laws; (3) the defendant uses "insufficient quality control measures"; or (4) the infringing product uses "British English spellings on the foreign product versus the American spellings on the domestic product." Ferris, 2019 WL 2541000, at *6.

The defendant's "sale of the materially different [f]oreign [p]roduct[s] also injures and tarnishes the reputation of [a plaintiff] and the goodwill in its [trademark] in violation of the federal . . . anti-dilution law[ ]." Bayer Corp. v. Custom School Frames, LLC, 259 F. Supp. 2d 503, 509 (E.D. La. 2003). A false designation of origin claim may exist where consumers are confused about the origin of the gray market products.[8] Rio Grande Food Prods., Inc. v. Cyclone Enters., Inc., H-18-3265, 2019 WL 3766376, at *2 (S.D. Tex. Aug. 9, 2019).

"[T]he FDCA and its regulations provide the United States with nearly exclusive enforcement authority, including the authority to seek criminal sanctions in some circumstances. . . . Private parties may not bring enforcement suits." POM Wonderful LLC v. Coca-Cola Co., 573 U.S. 102, 109 (2014) (citing 21 U.S.C. § 337). There is no private right of action to enforce the FDCA, and courts have sometimes dismissed claims where plaintiffs attempt to enforce it through Lanham Act claims. See Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1138–39 (4th Cir. 1993); Sandoz Pharms. Corp. v. Richardson-Vicks, Inc., 902

---

[8] The Court addresses the false designation of origin claim in more detail in Section III.C.

F.2d 222, 230–32 (3d Cir. 1990); Healthpoint, Ltd. v. Stratus Pharms., Inc., 273 F.

Supp. 2d 769, 793 (W.D. Tex. 2001); Summit Tech., 922 F. Supp. at 305–07.

However, this does not apply to all claims.  For example, in POM Wonderful, the

U.S. Supreme Court held that the FDCA did not preclude the plaintiff's particular

Lanham Act claim, reasoning that "the FDCA and the Lanham Act complement

each other in the federal regulation of misleading food and beverage labels."  573

U.S. at 106, 120–21.  In gray market goods cases, courts often find that regulatory

compliance is a material difference.  See Abbott Labs. v. Adelphia Supply USA,

No. 15-CV-5826, 2015 WL 10906060, at *6–7 (E.D.N.Y. Nov. 6, 2015) (granting

plaintiff's motion for a preliminary injunction), aff'd, 670 F. App'x 6 (2d Cir.

2016); Novartis Animal Health US, Inc. v. Abbeyvet Export Ltd., 409 F. Supp. 2d

264, 267 (S.D.N.Y. 2005); Bayer, 259 F. Supp. 2d at 506–07.

        In the Amended Complaint, Plaintiffs incorporate all of their previous

allegations into each of their claims brought under the Lanham Act.  (See Dkt.

# 26.)  Plaintiffs allege several material differences between their products and the

products sold by Defendants.  (Id.)  For example, Plaintiffs state that the gray

market products are not properly labeled in compliance with FDA regulations and

guidance.  (Id.)  The gray market products "have Spanish-only labels that contain

different nutritional information than the NUSA version of those products" and

"may contain formulations not intended for the United States market, and/or are

20

not subject to NUSA's rigorous quality control standards for post-sale services."

(Id.)  The labels also direct the consumer to different customer service lines.  (Id.)

Plaintiffs provide pictures of the labels of the NUSA products and the Nestlé

Mexico products to show their differences in appearance, such as font sizes,

bolding, spacing, lines between texts, naming and ordering of nutrients, and

appropriate serving sizes.  (Id.)  The labels on the NUSA products provide both

U.S. customary and metric units as required by FDA regulations, whereas the

Nestlé Mexico products sold by Defendants use only metric units.  (Id.)  While

NUSA provides numerous post-sale services including "returns, spoils allowances,

'scan-backs,' customer service, and in-store demonstrations," NUSA cannot

provide most of these services for Nestlé Mexico products because it did not

provide the retailers with those products and it was not involved with the

manufacture, labeling, distribution, or sale of the Nestlé Mexico products.  (Id.)

According to Plaintiffs, Defendants also place unauthorized stickers on top of the

original product labels.  (Id.)

Upon careful review, the Court finds that Plaintiffs are not attempting

to privately enforce the FDCA.  Plaintiffs point out numerous material differences

between the products that reference FDA regulations, but the material differences

are not the violations themselves.  (See id.)  Although there is not much Fifth

Circuit precedent on this issue, this case is similar to other cases outside of this

21

circuit.  In <u>Bayer</u>, the court found that the use of British English spellings on the foreign product instead of American English spellings were a material difference. <u>Bayer</u>, 259 F. Supp. 2d at 508–09 (finding also that "[t]he failure to comply with . . . federal and state laws and regulations constitutes a material difference").  In <u>Abbott</u>, the district court found that the plaintiff's references to FDA regulatory compliance were not attempts to enforce the regulations, but merely pointed out the regulations' "content to highlight the differences between the international and domestic products that customers would likely consider material."  2015 WL 10906060, at *6.  The court also found that consumers would likely find it relevant that the packaging "contains unexplained and unfamiliar symbols, atypical warnings, international units of measurement, and different languages."  <u>Id.</u>  Here, the Nestlé Mexico products use international units of measurement and Spanish on their labels.  (Dkt. # 26.)  These are material differences.

The cases that Defendants cite are easily distinguishable.  As the <u>Summit Technology</u> court pointed out itself, that case did not involve gray market goods.  922 F. Supp. at 310.  The court went into detail as to why this distinction is significant.[9]  <u>Id.</u>  Also, the holding in <u>Summit Technology</u> is much more limited

---

[9] The court stated,

> But this is not a "gray market" goods case. . . .  Accordingly, there is no danger that consumers are likely to be confused as to the *source* of the Summit laser systems—the main concern of trademark law.  On the face of

than Defendants suggest. The court held that "[a] Lanham Act cause of action cannot stand if it alleges that a defendant has failed to disclose the *fact* of FDA non-approval, when the FDA has not yet determined whether or not the product in question has been approved." Id. at 306. In other words, the plaintiff's cause of action was based on the fact that the defendants did not disclose that the products were not approved by the FDA.[10] That is not the case here. Here, Plaintiffs point to numerous material differences between the two products. (See Dkt. # 26.) Plaintiffs' claims are not based on the fact that Defendants failed to disclose that their products are not approved by the FDA. They reference FDA regulations only to point out material differences between the two products. (Id.) The other cases

---

the Complaint, Summit admits that all of the laser systems in question are manufactured and distributed by Summit itself, not by any foreign manufacturer. Although the various laser systems may have "material" differences, they are all genuine Summit manufactured products—none are "gray market" goods.

Summit Tech., Inc. v. High-Line Med. Instruments Co., 922 F. Supp. 299, 310 (C.D. Cal. 1996).

[10] Sandoz is not helpful here for a similar reason. Sandoz Pharms. Corp. v. Richardson-Vicks, Inc., 902 F.2d 222, 231 (3d Cir. 1990). In Sandoz, the plaintiff's cause of action under the Lanham Act was based on the fact that the defendant labeled an ingredient as "inactive" when FDA standards appeared to require that the ingredient be labeled as "active." Id. at 230–31. Because the FDA had not found conclusively that the ingredient should have been labelled as "active," the court dismissed the claim because the plaintiff's arguments would have required the court "to usurp administrative agencies' responsibility for interpreting and enforcing potentially ambiguous regulations." Id. at 231. Issues similar to the one in Sandoz are not present in this case.

that Defendants rely on are similarly not gray market goods cases.  See

Healthpoint, 273 F. Supp. 2d at 792–93; Pamlab, L.L.C. v. Brookstone Pharms.,

L.L.C., No: 09-7434, 2010 WL 11541920, at *13–14 (E.D. La. Feb. 23, 2010).

Because it is clear that Plaintiffs do not seek to enforce the FDCA or

FDA regulations through their Lanham Act claims, the Court will not dismiss these

claims on this basis.

B.    Post-sale services

Defendants next contend that Plaintiffs' claims must be dismissed

because post-sale differences alone cannot form the basis for Lanham Act

violations.  (Dkt. # 37.)  They cite one district court case outside of this circuit in

support of their argument.  (Id.)

As described above, Plaintiffs explained in great detail the other

material differences between the products in their amended complaint, they did not

solely base their Lanham Act claims on post-sale differences.  (See Dkt. # 26.)

The Court rejects Defendants' argument with respect to this issue.

C.    False Designation of Origin Claim

Defendants then address Plaintiffs' false designation of origin claim

specifically.  They argue that Plaintiffs failed to allege any misstatement or

misrepresentation by Defendants regarding the origin of the Nestlé Mexico

products that Ultra International sells.  (Dkt. # 37.)  In response, Plaintiffs contend

24

that Defendants focus only on the geographic origin of the goods, not "Defendants' unauthorized behavior in associating and affiliating the grey market products with the protected marks and NUSA." (Dkt. # 41.) Plaintiffs maintain that their allegations are sufficient to survive a motion to dismiss.

Under 15 U.S.C. § 1125(a), there are two different subsections under which plaintiffs may bring this claim. False designation of origin claims are brought under § 1125(a)(1)(A) while false advertising claims are brought under § 1125(a)(1)(B). See Test Masters Educ. Servs., Inc. v. Singh, 428 F.3d 559, 568 (5th Cir. 2005). It appears from the Amended Complaint that Plaintiffs bring their claim under § 1125(a)(1)(A) for false designation of origin, and Plaintiffs have clarified as such in their response. (See Dkts. ## 26, 41.)

The word "origin" in § 1125(a)(1)(A) does not refer merely to geographic origin. See Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 37 (2003); Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc., 982 F.2d 638, 639–40 (1st Cir. 1992) (finding that in cases where the geographic origin of the products is clearly specified, the key question in determining liability is "whether material differences likely to confuse consumers exist between Venezuelan-made and Italian-made chocolates bearing the same mark"). The Supreme Court has explained that the Trademark Law Revision Act of 1988 clarified that the word "origin" "refers to the producer of the tangible goods that

25

are offered for sale." Dastar, 539 U.S. at 37; see McArdle v. Mattel Inc., 456 F. Supp. 2d 769, 783 (E.D. Tex. 2006) ("'Origin' means not only geographic location, but also the source of actual production."). However, "[t]he term does not connote the person or entity that originated the ideas, concepts, or communications embodied in goods." McArdle, 456 F. Supp. 2d at 783; see Gen. Universal Sys., Inc. v. Lee, 379 F.3d 131, 149 (5th Cir. 2004).

The plaintiff must prove the following five elements to establish false designation of origin:

> (1) The defendant made a false or misleading statement of fact about its product or service;
>
> (2) The statement either deceived or had the capacity to deceive a substantial segment of potential customers;
>
> (3) The deception was material, in that it was likely to influence consumers' purchasing decisions;
>
> (4) The product or service is in interstate commerce; and
>
> (5) The plaintiff has been or is likely to be injured as a result of the statement at issue.

Pizza Hut, Inc. v. Papa John's Intern., Inc., 227 F.3d 489, 495 (5th Cir. 2000).[11]

---

[11] The Court recognizes that Pizza Hut involved a false advertising claim under 15 U.S.C. § 1125(a)(1)(B), not a false designation of origin claim under § 1125(a)(1)(A). See Pizza Hut, Inc. v. Papa Johns Int'l, Inc., 227 F.3d 489, 494–95 (5th Cir. 2000). Although there are a few courts in this circuit that have decided not to apply the Pizza Hut elements to claims under § 1125(a)(1)(A), the majority of courts within this circuit apply these elements to claims brought under both subsections. See York Grp., Inc. v. York S., Inc., No. H-06-0262, 2006 WL 3057782, at *4 (S.D. Tex. Oct. 25, 2006) (citing cases construing both sections);

26

The Court finds that, at this stage of the litigation, Plaintiffs have adequately pled their false designation of origin claim. First, Plaintiffs have alleged that "[b]y selling gray market goods, [Defendants] misrepresented facts." Rio Grande Food Prods., 2019 WL 3766376, at *2. As Plaintiffs have pled, the gray market goods have the capacity to deceive many customers who thought they were buying "products authorized to be sold in the U.S." Id.; (see Dkt. # 26.) Plaintiffs have adequately pled that the deception would be material and consumers would likely be injured as a result of the deception because consumers may be expecting a product that meets a higher standard of quality, when in reality, it does not. See Rio Grande Food Prods., 2019 WL 3766376, at *2. Further, it is alleged that the products are in interstate commerce, as they come from Mexico and then are sold in California, Texas, and other states. (See Dkt. # 26.) Finally, Plaintiffs were not required to plead their claim in the context of "geographic origin," as the word "origin" also refers to the producer of the tangible goods. See Dastar, 539

---

see also Dupart v. Roussell, No. 20-1406, 2020 WL 6308339, at *10 (E.D. La. Oct. 28, 2020) (explaining that Pizza Hut applies to false advertising claims and false designation of origin claims); Deaf Interpreter Servs., Inc. v. Webbco Enters., L.L.C., No. 5:13-867-RCL, 2015 WL 11565191, at *12 n.9 (W.D. Tex. Feb. 11, 2015) ("Although the Pizza Hut case arises from a false advertising claim, courts in this circuit apply the same legal standard to false designation of origin claims as well."); Heartbrand Beef, Inc. v. Lobel's of N.Y., LLC, No. V-08-62, 2009 WL 311087, at *2 (S.D. Tex. Feb. 5, 2009) ("Fortunately, while there appears to be confusion over terminology and code sections, the Fifth Circuit consistently lists five elements to be proven whether the claim arises under subsection (a)(1)(A) or (B), and regardless of what the claim is labeled.").

U.S. at 37.  For these reasons, the Court denies Defendants' motion to dismiss Plaintiffs' false designation of origin claim under the Lanham Act.

III.    The Tariff Act

Defendants also seek dismissal of Plaintiffs' claims under the Tariff Act.  As described above, Plaintiffs no longer wish to further prosecute this claim and do not oppose Defendants' request for dismissal of Count 4, Unlawful Importation of Goods Infringing U.S. Trademarks or Names, 15 U.S.C. § 1124 and 19 U.S.C. § 1526.  The Court therefore dismisses this claim.

IV.    Unfair Competition under California Law

Defendants seek to dismiss Plaintiffs' claims for unfair competition under California law.  (Dkts. ## 37, 47.)  However, there appears to be a dispute between the parties regarding whether Defendants addressed Count 9, Plaintiffs' common law unfair competition claim, in their motion to dismiss.  (See Dkts. ## 41, 47.)  In their response, Plaintiffs state that Defendants did not make any arguments in support of dismissing Count 9 in their motion to dismiss.  (Dkt. # 41.) Defendants maintain, however, that they did make arguments in support of dismissing Count 9.  (Dkt. # 47.)

Statutory and common law unfair competition claims are akin to "passing off."[12]  Aquawood, LLC v. Toys "R" Us-Del., Inc., No. 2:15-CV-05869-AB (MRWx), 2016 WL 10576620, at *2–3 (C.D. Cal. Mar. 10, 2016); see Summit Tech., 933 F. Supp. at 943 ("The [c]ourt sees no difference between statutory unfair competition and common law unfair competition" because both address "likelihood of consumer confusion as to source or sponsorship"); see also Sybersound Records, Inc. v. UAV Corp., 517 F.3d 1137, 1153 (9th Cir. 2008) (dismissing common law unfair competition claim because the plaintiffs failed to allege that the defendants "passed off their goods as those of another []or that they exploit[ed] trade names or trademarks"); Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1147 (9th Cir. 1997) (dismissing common law unfair competition claim because the plaintiffs' allegations did not amount to "passing off"); Acad. of Motion Picture Arts & Sciences v. Creative House Promotions, Inc., 944 F.2d 1446, 1457 (9th Cir. 1991) (explaining that a statutory claim for unfair competition is "'substantially congruent' to a trademark infringement claim under the Lanham Act"); Bank of the W. v. Superior Court, 833 P.2d 545, 551 (Cal. 1992)

---

[12] Some courts have held that the common law tort also includes acts that are analogous to "passing off," "such as the sale of confusingly similar products, by which a person exploits a competitor's reputation in the market." Bank of the W. v. Superior Court, 883 P.2d 545, 551 (Cal. 1992). According to one federal district court, the cornerstone of a common law unfair competition claim is fraud. See Mattel, Inc. v. MGA Entm't, Inc., 782 F. Supp. 2d 911, 1013 (C.D. Cal. 2011).

(explaining that the "common law tort of unfair competition is generally thought to be synonymous with the act of 'passing off' one's goods as those of another.").

"'Passing off' consists of confusing the public and misleading them into thinking that [the] defendant's product is actually the plaintiff's." Aquawood, 2016 WL 10576620, at *3; see Fisher v. Dees, 794 F.2d 432, 440 (9th Cir. 1986) ("[T]his confusion must be of a specific kind: the public must be misled into thinking that the defendant's product is actually the plaintiff's."). "The decisive test of common law unfair competition is whether the public is likely to be deceived about the source of goods or services by the defendant's conduct." Hokto Kinoko Co. v. Concord Farms, Inc., 810 F. Supp. 2d 1013, 1032 (C.D. Cal. 2011). California's Unfair Competition Law ("UCL") "prohibits, and provides civil remedies for, unfair competition, which it defines as 'any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising.'" Obesity Rsch. Inst., LLC v. Fiber Rsch. Int'l, LLC, 165 F. Supp. 3d 937, 952 (S.D. Cal. 2016) (quoting Kwikset Corp. v. Superior Court, 246 P.3d 877, 883 (Cal. 2011)).

None of the cases that Defendants cite in support of dismissal involve common law unfair competition claims. (See Dkt. ## 37.) Defendants also do not clarify in the motion on what grounds they move to dismiss Plaintiffs' common

law claims vs. the statutory claims.[13]  (Id.)  They bring their arguments for dismissing Plaintiffs' common law unfair competition claim in their reply for the first time.  (Dkt. # 47.)  Because "[a]rguments raised for the first time in a reply brief are generally waived," the Court finds that Defendants have waived their arguments in support of dismissing Plaintiffs' common law unfair competition claim.  Jones v. Cain, 600 F.3d 527, 541 (5th Cir. 2010).  The Court will, however, address Defendants' motion to dismiss Plaintiffs' statutory unfair competition claim.

Defendants make two principal arguments for dismissing Plaintiffs' statutory unfair competition claim.  First, Defendants contend that Plaintiffs do not have standing to bring their claim.  (Id.)  Second, Defendants maintain that Plaintiffs failed to plead that Defendants' acts were unfair, unlawful, or fraudulent. (Id.)  The Court will address these arguments in turn.

---

[13] Defendants do not address the issue of "passing off" in their motion to dismiss. (See Dkt. # 37.)  When stating that the elements for California statutory unfair competition claims are the same as the elements for common law claims, Defendants cite the unfair competition statute and a case that does not involve a common law claim.  (Dkt. # 37); see Cal. Bus. & Prof. Code § 17200; CYBERsitter, LLC v. Google, Inc., 905 F. Supp. 2d 1080, 1087 (C.D. Cal. 2012). Defendants bring their standing arguments only in the context of the statutory claim.  (See Dkts. ## 37, 47.)  Their other arguments with respect to failure to plead unlawful, unfair, or fraudulent conduct are also brought in the context of the statutory claim.  (Id.)

A.      Standing

According to Defendants, plaintiffs must allege the loss of money or property and "actual reliance" on Defendants' conduct to properly establish standing under the UCL.  (Id.)  Because Plaintiffs seek only injunctive relief and do not allege that they actually relied on Defendants' conduct, Defendants maintain that these claims should be dismissed.  (Id.)  In response, Plaintiffs argue that they have standing to bring these claims.  According to Plaintiffs, their allegations that "Defendants' conduct has damaged their goodwill and reputation; caused retailers and consumers to purchase Defendants' goods rather than Plaintiffs' goods; and damaged Plaintiffs' relationships with its customers, distributors, and other business partners" were all incorporated into Plaintiffs' causes of action, and are sufficient to allege injury in fact.  (Dkt. # 41.)  In their reply, Defendants rely on an unreported district court case in support of their argument that these allegations are insufficient to confer standing.  (Dkt. # 47); see Quadrant Info. Servs., LLC v. LexisNexis Risk Sols., Inc., No. C 11-6648 SBA, 2012 WL 3155559, at *4 (N.D. Cal. Aug. 2, 2012).

"The UCL prohibits, and provides civil remedies for, unfair competition, which it defines as 'any unlawful, unfair or fraudulent business act or practice.'"  Demeter v. Taxi Comp. Servs., Inc., 230 Cal. Rptr. 3d 817, 825 (Ct. App. 2018) (quoting Cal. Bus. & Prof. Code § 17200).  Its purpose "is to protect

32

both consumers and competitors by promoting fair competition in commercial markets for goods and services." Kwikset Corp. v. Superior Court, 246 P.3d 877, 883 (Cal. 2011) (quoting Kasky v. Nike, Inc., 45 P.3d 243, 249 (Cal. 2002)).

Proposition 64, passed in November 2004, narrowed the standing requirement for California unfair competition claims brought by those actually injured by a defendant's unlawful business practice. Obesity Rsch., 165 F. Supp. 3d at 947. Actions brought under the UCL for unfair competition "shall be prosecuted . . . upon the complaint of a . . . corporation . . . or by a person who has suffered injury in fact and has lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code. § 17204. To satisfy the standing requirement, the plaintiff must "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., economic injury, and (2) show that the economic injury was the result of, i.e., caused by, the unfair business practice or false advertising that is the gravamen of the claim." Obesity Rsch., 165 F. Supp. 3d at 947 (quoting Kwikset, 246 P.3d at 885); Demeter, 230 Cal. Rptr. 3d at 825 (quoting Two Jinn, Inc. v. Gov't Payment Serv., Inc., 183 Cal. Rptr. 3d 432, 439 (Ct. App. 2015)).

33

1. Injury in Fact

"[B]ecause economic injury is but one among many types of injury in fact, the Proposition 64 requirement that injury be economic renders standing under section 17204 substantially narrower than federal standing under article III, section 2 of the United States Constitution, which may be predicated on a broader range of injuries." Kwikset, 246 P.3d at 886.  The economic injury must be concrete and particularized and actual or imminent.  Obesity Rsch., 165 F. Supp. 3d at 947.

There are many ways that a plaintiff can demonstrate economic injury.  For example, courts have found that lost sales, revenue, market share, asset value, and goodwill are economic injuries.  Obesity Rsch., 165 F. Supp. 3d at 948 (citing cases).  "Goodwill is a protected property interest and harm to goodwill is a cognizable injury."  Id. at 948 n.1 (citing Soranno's Gasco, Inc. v. Morgan, 874 F.2d 1310, 1316 (9th Cir. 1989)).

Under California law, labels matter.  The California Supreme Court has stated,

> The marketing industry is based on the premise that labels matter, that consumers will choose one product over another similar product based on its label and various tangible and intangible qualities they may come to associate with a particular source. . . .  [T]rademark law . . . exists to protect commercial and consumer interests in accurate label representations as to source, because consumers rely on the accuracy of those representations in making their buying decisions.

34

Kwikset, 246 P.3d at 889.  Given this, the Court finds that Plaintiffs have

sufficiently alleged injury in fact.  Under California law, goodwill is a property

interest and a cognizable injury.  See Obesity Rsch., 165 F. Supp. 3d at 948 n.1.

Plaintiffs further alleged that Defendants' acts caused retailers and consumers to

purchase Defendants' goods rather than Plaintiffs' goods, which involves loss or

deprivation of money.  See Cal. Bus. & Prof. Code. § 17204.  These allegations are

sufficient to plead economic injury.[14]

### 2. Causation

The causation requirement "does not require a plaintiff 'to allege that

the challenged misrepresentations were the sole or even the decisive cause of the

injury-producing product.'"[15]  Obesity Rsch., 165 F. Supp. 3d at 947 (quoting

Kwikset, 246 P.3d at 888).  "At the pleading stage, general factual allegations of

---

[14] Because the Court finds that Plaintiffs have alleged economic injury, the Court need not analyze whether Plaintiffs' allegations that Defendants' acts damaged Plaintiffs' relationships with its customers, distributors, and other business partners constitute an "economic injury" within the meaning of the UCL.

[15] The California Supreme Court has held that UCL claims brought under the fraud prong require "actual reliance" rather than mere causation.  In re Tobacco II, 207 P.3d 20, 39 (Cal. 2009).  The California Supreme Court has refrained from extending this to other prongs under the UCL that are not based on misrepresentation and deception.  See Kwikset Corp. v. Superior Court, 246 P.3d 877, 888 n.9 (Cal. 2011); In re Tobacco II, 207 P.3d at 39 n.17.

injury resulting from the defendant's conduct may suffice." Kwikset, 246 P.3d at 888.

However, plaintiffs bringing a private enforcement action for unfair competition under the fraud prong must show actual reliance. In re Tobacco II Cases, 207 P.3d 20, 39 (Cal. 2009). In order to satisfy this requirement, "a plaintiff must allege that the defendant's misrepresentations were an immediate cause of the injury-causing conduct." Id. at 40. The actual reliance must be on the part of the plaintiff—not the consumer.[16] 23andMe, Inc. v. Ancestry.com DNA, LLC, 356 F. Supp. 3d 889, 911 (N.D. Cal. 2018). This also applies to unfair competition claims brought under the "unlawful" prong where the alleged unlawful conduct is based on misrepresentations or deception. Kwikset, 246 P.3d at 888 n.9.

To the extent Defendants argue that Plaintiffs did not plead causation with respect to the "unlawful" prong, the Court swiftly rejects this argument.

---

[16] The Northern District of California pointed out that "'[n]o California [state] court has addressed' whether 'competitor plaintiffs must plead their own reliance or whether pleading consumer reliance is sufficient for fraudulent business practice claims brought by competitors.' [And while] [t]here is a split among district courts sitting in California on this issue, . . . the majority view appears to be that a plaintiff must be able to allege its own reliance 'rather than the reliance of third parties.'" 23andMe, Inc. v. Ancestry.com DNA, LLC, 356 F. Supp. 3d 889, 911 (N.D. Cal. 2018) (quoting A White & Yellow Cab, Inc. v. Uber Techs., Inc., No. 15-CV-05163-JSW, 2017 WL 1208384, at *8 (N.D. Cal. Mar. 31, 2017)). As the court in 23andMe also pointed out, this makes sense because traditional fraud claims cannot be premised on third-party reliance. Id.

Plaintiffs incorporated all of their previous allegations against Defendants in their unfair competition claim under the UCL.  (See Dkt. # 26.)  In the Amended Complaint, Plaintiffs alleged that Defendants sold the gray market products in the United States, which could be confused with NUSA's products that are materially different from the gray market products, and this caused Plaintiffs' injuries.  (Id.) Plaintiffs made these allegations in detail and even provided the Court with pictures displaying the differences between the products at issue.[17]  (Id.)  At the pleading stage, Plaintiffs have met their burden of demonstrating causation with respect to the "unlawful" prong.

However, Plaintiffs have not adequately alleged actual reliance and thus do not appear to have standing to bring their UCL claim under the fraud prong.[18]  See In re Tobacco II, 207 P.3d at 39.  Although Plaintiffs alleged that

---

[17] Defendants rely on an unpublished case, Quadrant Information Services, LLC v. LexisNexis Risk Solutions, Inc., in support of their argument that Plaintiffs' allegations are not sufficient to establish standing.  No. C 11-6648 SBA, 2012 WL 3155559, at *3–4 (N.D. Cal. Aug. 2, 2012).  However, Quadrant is different.  In Quadrant, the district court found that Plaintiffs' conclusory allegation that "[Plaintiff] has suffered injury in fact and has lost money as a result of [Defendant's] unfair competition" was insufficient to establish standing.  Id. at *4. The allegations that Plaintiffs incorporate by reference into their unfair competition claim are not conclusory, they include detailed factual allegations, pictures of the products, and an explanation of their alleged injuries.  (See Dkt. # 26.)
[18] Actual reliance is not required for the unlawful conduct prong as it was in Kwikset because not all of Plaintiffs' causes of action are solely based on misrepresentation and deception.  See Kwikset, 246 P.3d at 888 n.9; (Dkt. # 26.)

consumers relied on Defendants' misrepresentations, Plaintiffs needed to allege that they—not the consumers—actually relied on Defendants' misrepresentations. 23andMe, 356 F. Supp. 3d at 911; A White & Yellow Cab, Inc. v. Uber Techs., Inc., No. 15-CV-05163-JSW, 2017 WL 1208384, at *8 (N.D. Cal. Mar. 31, 2017). Because they did not do so, they do not have standing to bring an unfair competition claim under the fraud prong.[19]

B.    Unlawful and Unfair Conduct

Defendants contend that Plaintiffs' UCL claim should be dismissed because they failed to plead unlawful, unfair, or fraudulent conduct.  Because the Court finds that Plaintiffs do not have standing to bring their unfair competition claim under the fraud prong, the Court will entertain Defendants' arguments only with respect to the unlawful and unfair prongs.

---

[19] Although Plaintiffs cite several cases where courts found that the fraud prong and the unlawful prong were met when the plaintiff alleged violation of trademark laws, those courts did not address the standing issue or analyze the fraud prong in depth.  See Baskin-Robbins Franchising LLC v. Chun, No. 18-CV-05476-BLF, 2019 WL 3207777, at *5 (N.D. Cal. July 16, 2019) (entering default judgment for unfair competition without providing an in-depth explanation of the fraud prong or grappling with standing issues); JS Led Tech. Corp. v. Zhang, No. CV-14-02250-RGK (PJWx), 2014 WL 12561075, at *9 (C.D. Cal. Aug. 7, 2014) (denying the defendant's motion to dismiss the plaintiff's unfair competition claim merely because the plaintiff sufficiently alleged claims for state trademark infringement); Celebrity Chefs Tour, LLC v. Macy's Inc., 16 F. Supp. 3d 1141, 1156 (S.D. Cal. 2014) (analyzing the fraud prong without addressing the standing requirements).

The UCL prohibits "unfair competition," which is broadly defined as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising . . ." See Cal. Bus. & Prof. Code § 17200.  Each prong of the UCL provides a separate and distinct theory of liability.  Lozano v. AT&T Wireless Servs., Inc., 504 F.3d 718, 731 (9th Cir. 2007); In re Anthem, Inc. Data Breach Litig., 162 F. Supp. 3d 953, 984 (N.D. Cal. 2016); Cel-Tech Comm'ns, Inc. v. L.A. Cellular Tele. Co., 973 P.2d 527, 540 (Cal. 1999).

### 1.  Unlawful conduct

An "unlawful" business act includes "anything that can properly be called a business practice and that at the same time is forbidden by law."  Khan v. CitiMortgage, Inc., 975 F. Supp. 2d 1127, 1144 (E.D. Cal. 2013); Blank v. Kirwan, 703 P.2d 58, 69 (Cal. 1985).  The UCL prohibits "unlawful" practices "forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made."  Saunders v. Superior Court, 33 Cal. Rptr. 2d 438, 441 (Ct. App. 1994).  The statute "thus creates an independent action when a business practice violates some other law."  Walker v. Countrywide Home Loans, Inc., 121 Cal. Rptr. 2d 79, 87 (Ct. App. 2002).  In other words, the UCL borrows other statutes and makes violations of such laws independently actionable under the UCL.  Farmers Ins. Exch. v. Superior Court, 826 P.2d 730, 734 (Cal. 1992).

According to Defendants, Plaintiffs rely on only one allegation to support their claim under the unlawful prong, that "Defendants' marketing and advertisement of products with the Nestlé Marks in the United States . . . was intended to and did mislead customers to purchase Nestlé Mexico Products … with the belief that such products were manufactured or distributed by NUSA, in violation of California Business and Professions Code § 17500."  (Dkt. # 37); (see Dkt. # 26 ¶ 110.)

The Court does not agree with Defendants' contention.  Plaintiffs incorporated by reference their allegations from their previously stated causes of action, including their allegations that Defendants violated the Lanham Act.  (Dkt. # 26.)  Because the Court finds that Plaintiffs have sufficiently pled their claims under the Lanham Act, Plaintiffs have adequately pled that Defendants engaged in unlawful conduct.

2.  Unfair Conduct

The word "unfair" in section 17200 "means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition."  Cel-Tech, 973 P.2d at 544.  Defendants argue that Plaintiffs have not alleged unfair conduct.  Plaintiffs did not address the unfair conduct prong in their response.

40

The Court agrees with Defendants.  Plaintiffs did not sufficiently allege that Defendants engaged in "unfair conduct" within the meaning of the UCL, and Plaintiffs failed to address the issue in their response.  Thus, Plaintiffs have not pled unfair conduct under the UCL.

Because Plaintiffs do have a claim under the UCL for unfair competition under the unlawful conduct prong, the Court denies Defendants' motion to dismiss with respect to Plaintiffs' UCL claim based only on the unlawful prong.

V.    Texas Trademark Dilution

Defendants seek dismissal of Plaintiffs' Texas trademark dilution claim.  They contend that although Plaintiffs alleged that the Nestlé marks at issue are famous throughout the United States and the world, they failed to allege that they are famous in Texas.  (Dkt. # 37.)  Plaintiffs respond that their allegations are sufficient to plead "fame" in Texas and point out that courts in this circuit have denied motions to dismiss trademark dilution claims that alleged fewer factual detail than Plaintiffs alleged.  (Dkt. # 41.)

The Texas Anti-Dilution statute states,

[T]he owner of a mark that is famous and distinctive, inherently or through acquired distinctiveness, in this state is entitled to enjoin another person's commercial use of a mark or trade name that begins after the mark has become famous if use of the mark or trade name is likely to cause the dilution of the famous mark.

41

Tex. Bus. & Comm. § 16.103(a).  When analyzing whether a trademark is "famous," a court may consider many factors including

> (1) the duration, extent, and geographic reach of the advertisement and publicity of the mark in this state, regardless of whether the mark is advertised or publicized by the owner or a third party; (2) the amount, volume, and geographic extent of sales of goods or services offered under the mark in this state; (3) the extent of actual recognition of the mark in this state; and (4) whether the mark is registered in this state or in the United States Patent and Trademark Office.

Tex. Bus. & Comm. § 16.103(b).

The Court finds that Plaintiffs have alleged "enough facts to state a claim to relief that is plausible on its face."  See Twombly, 550 U.S. at 570.  The allegations in the Amended Complaint meet several factors that courts may consider when determining whether a trademark is famous.  See Tex. Bus. & Comm. § 16.103(b).  For example, Plaintiffs alleged that their marks "have acquired a high degree of fame in the minds of US consumers through consistent use over decades, widespread and substantial advertisement and promotion by NUSA, and tremendous commercial success of the Products nationwide."  (Dkt. # 26.)  Plaintiffs also alleged that their marks are famous throughout the United States, "including in Texas."  (Id.)  To support this statement, Plaintiffs provide Nescafé's brand value and rankings associated with that value.  (Id.)  Further, Plaintiffs alleged that NUSA's products "are marketed under a brand name that is

42

subject to a trademark registered at the U.S. Patent and Trademark Office." (Id.) These allegations are sufficient to survive a motion to dismiss.

The Court acknowledges the difficulty of establishing "fame" for dilution claims. For example, one court held that the University of Texas's longhorn silhouette logo was insufficiently famous for the plaintiff to proceed with its claim under the federal Trademark Dilution Revision Act ("TDRA") beyond the summary judgment stage. Bd. of Regents, the Univ. of Tex. Sys. v. KST Elec., Ltd., 550 F. Supp. 2d 657, 679 (W.D. Tex. 2008). However, there are two reasons why that case is different from the present case. First, that case was decided at the summary judgment stage, not at the motion to dismiss stage. Id. Second, even though the Texas "fame" analysis is similar to the one under federal law, the geographic scope is different. It is much more difficult to demonstrate that a trademark is famous on the national level as opposed to the state level. See id. at 675 ("[I]t simply does not matter, for purposes of a federal dilution cause of action, what the results are of a survey conducted of people in the Austin metropolitan area or the State of Texas" because "the TDRA specifically requires that the mark be 'widely recognized by the general consuming public of the United States'"). As many other courts within this circuit and district have concluded, the Court finds that Plaintiffs' allegations with respect to "fame" survive the dismissal stage. See Gabbanelli Accordions & Imports, LLC v. Hermes Music Co., 398 F. Supp. 3d

43

156, 160 (S.D. Tex. 2019) (holding that the plaintiff sufficiently alleged that its trademarks were famous under the Texas Anti-Dilution Statute by asserting that their trademarks were "widely recognized by the public" in Texas and by providing an account of the defendants' advertisement of allegedly infringing products via social media); Haas Outdoors, Inc. v. Dryshod Int'l, LLC, No. 1:18-CV-978-RP, 2019 WL 3130231, at *5 (W.D. Tex. July 15, 2019) (holding that the plaintiff sufficiently alleged the "fame" element for its TDRA claim because the plaintiff raised its right to relief above a speculative level at the motion to dismiss stage); YETI Coolers, LLC v. Imagen Brands, LLC, No. 1:16-CV-00578, 2017 WL 2199012, at *8 (W.D. Tex. May 18, 2017) (holding that the plaintiff sufficiently alleged that their trade dresses were "famous" for their state and federal trade dress dilution claims because, despite the high bar for establishing "fame," plaintiff's allegations met the Twombly and Iqbal standard).

At the motion to dismiss stage, the plaintiff must plead only "enough facts to state a claim to relief that is plausible on its face," and Plaintiffs have done so here. Twombly, 550 U.S. at 570. The Court denies Defendants' motion to dismiss Plaintiffs' Texas trademark dilution claim.

44

VI.    Tortious Interference with Existing Business Relations Claim

Finally, Defendants seek to dismiss Plaintiffs' tortious interference claim. They argue that Plaintiffs were required to identify a specific party, relationship, or contract that Defendants interfered with, and they failed to do so. (Dkt. # 37.) For this reason, Defendants maintain that Plaintiffs' allegations are nothing more than recitations of the elements of the claim.

In response, Plaintiffs argue that courts in this circuit deny motions to dismiss tortious interference claims when the plaintiff identifies groups of entities with which it has an existing contractual relationship. (Dkt. # 41.) According to Plaintiffs, they alleged that NUSA's authorized distributors each "separately enter[] into an agreement with NUSA in order to distribute NUSA products," and these agreements provided the authorized distributors with specific rights and benefits, including the right to use registered trademarks. (Id.) Plaintiffs distinguish the cases that Defendants rely on by pointing out that those cases presented situations where the plaintiffs did not allege *any* existing contractual relationship. (Id.)

In their reply, Defendants argue that "Plaintiffs cannot salvage their improperly pled tortious interference claim by arguing now, *for the first time*, that this claim relates to their contracts with distributors." (Dkt. # 47.) Plaintiffs'

45

amended complaint alleges interference only with NUSA's "existing economic relationships with each of its existing customers." (Id.)

"A claim for tortious interference with existing business relations has the following elements: (1) an existing contract subject to interference; (2) a willful and intentional act of interference with the contract; (3) that proximately caused the plaintiff's injury; and (4) caused actual damages or loss." Priority Design & Serv., Inc. v. Plaza, No. SA-19-CV-00058-OLG, 2019 WL 2124677, at *4 (W.D. Tex. May 15, 2019) (citing Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc., 29 S.W.3d 74, 77 (Tex. 2000)). The plaintiff must plead "an actual contract with an existing client." Id.; Greater Hous. Transp. Co. v. Uber Techs., Inc., No. 4:14-0941, 2015 WL 1034254, at *18 (S.D. Tex. Mar. 10, 2015).

In support of their claim, Plaintiffs allege that "NUSA had existing economic relationships with each of its existing customers. Each of those relationships benefited NUSA economically and likely would have continued to benefit NUSA economically in the future." (Dkt. # 26.) Plaintiffs further allege Defendants were aware of these economic relationships and they intentionally interfered with them. (Id.) However, Plaintiffs also incorporate by reference their previously stated allegations into this cause of action. (Id.) Elsewhere in the Amended Complaint, Plaintiffs state that they characterize this claim as "tortious interference with existing business relationships with legitimate distributors under

46

Texas law." (Id.)  Plaintiffs further describe their agreements with their distributors in the Amended Complaint, stating that the distributors enter into an agreement with NUSA in order to distribute the products, and they have certain rights and benefits—"including, in some instances, the exclusive right to distribute NUSA products within a designated region or territory." (Id.)  Further, they allege that Defendants' actions "have resulted and will continue to result in substantial losses to NUSA and its authorized distributors, disruptions to NUSA's business relationships with its customers[,] and the rights that NUSA has granted to its authorized distributors." (Id.)

These allegations are sufficient to survive a motion to dismiss. Contrary to Defendants' contention, Plaintiffs do not allege interference with their contracts with distributors for the first time in their response.  In the Amended Complaint, Plaintiffs incorporated their previously stated allegations into their cause of action and repeatedly point out Defendants' alleged interference with these contracts.  (Id.)  The Court denies Defendants' motion to dismiss this claim.

CONCLUSION

For the reasons stated above, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion to Dismiss (Dkt. # 37).  The Court **GRANTS** Defendants' motion to dismiss Plaintiffs' claim for Unlawful Importation of Goods Infringing U.S. Trademarks or Names, 15 U.S.C. § 1124 and

47

19 U.S.C. § 1526 (Count 4).  The Court, however, **DENIES** Defendants' motion with respect to Plaintiffs' other claims, as discussed above.

      **IT IS SO ORDERED**.

      **DATE:** San Antonio, Texas, February 1, 2021.

_____

David Alan Ezra
Senior United States District Judge

48